[Civ. No. 4184. Third Appellate District.—April 17, 1931.]

F. E. CONNER et al., Appellants, v. J. W. S. BUTLER et al., Respondents.

Martin I. Welsh and Anson H. Morgan for Appellants.

B. F. Van Dyke, Sheridan Downey and T. A. Farrell for Respondents.

MR. JUSTICE THOMPSON (R. L.) DELIVERED THE OPINION OF THE COURT.—This is an appeal from a judgment in favor of the defendants which was entered upon the rendering of a verdict in an action based upon a promissory note. The plaintiffs sued for $37,383. The answer denied defendants' liability on the ground that the note was procured by means of fraud. A cross-complaint was filed demanding $85,000 damages as a result of the fraud. A verdict was rendered against the plaintiffs and in favor of the defendants on their cross-complaint for the sum of $38,000. Judgment was entered accordingly. Upon motion for a new trial the court required the defendants to waive their judgment for $38,000 as a condition to the denial of a new trial. The judgment for damages was thereupon waived by the defendants. From that portion of the judgment which decrees that the plaintiffs take nothing by their action this appeal was perfected.

In the following opinion F. E. Conner will be referred to as the plaintiff and J. W. S. Butler as the defendant.

The Sacramento Lumber Company, a corporation, was located at Sacramento. For ten years the plaintiff was em-

ployed as general manager of this company at a salary of $300 a month. This business was formerly owned by the Coos Bay Lumber Company. The defendant is an attorney at law who for many years has been engaged in active practice of his profession at Sacramento. He was without previous experience as a lumber dealer. For many years the plaintiff and defendant were intimate friends. The defendant was serving as an attorney for the Sacramento Lumber Company. In 1919 the plaintiff became the owner of the entire business. Subsequently the defendant was persuaded to purchase one-half of the stock of the company. The plaintiff continued to operate the business as the manager thereof. The defendant had no personal knowledge of the quality, quantity or grade of lumber on hand. He knew nothing concerning the financial standing of the customers or the condition of the book of accounts, except such accounts as were entrusted to him for collection. In the management of the business he relied implicitly upon the plaintiff. Regarding his participation in the affairs of the company, Mr. Butler testified: "I was a stockholder sitting on the side lines." At the time the defendant purchased his original half-interest in the business a written agreement was made between the parties by the terms of which Mr. Conner became the sole manager of the business at a salary of $500 a month. The plaintiff also assumed entire charge of the book accounts and collections. Monthly statements of the assets, liabilities and transactions of the business were prepared and furnished to the defendant by the plaintiff. December 31, 1923, a report of the business was prepared and presented to the defendant by Mr. Conner, which he said was "an authentic statement of the condition of the business at that time". There were then about 3,000,000 feet of lumber in the yard. This inventory showed:

Lumber on hand of specified grades....$134,411.29
Value of plant....................... 96,377.63
Accounts receivable ................. 114,676.15
Notes receivable .................... 16,878.00

Total assets ....................$262,343.07

About the time this statement was rendered, as Mr. Conner testified, "five or six months prior" to the sale of the

business to the defendant, which occurred May 16, 1924, the plaintiff first urged Mr. Butler to buy his interest in the company. The plaintiff then represented that his share was worth $100,000. Mr. Butler testified in this regard that he heard Mr. Conner had been trying to sell his stock to one Knox, and that he therefore inquired of the plaintiff regarding this rumor. In that conversation Mr. Conner said to the defendant, "Why don't *you* buy me out?" To this inquiry Mr. Butler replied, "I am no lumber man." Conner then suggested that he place the defendant's son in charge of the business. Mr. Butler said, "That does not seem to me to be within the limits of good business judgment, . . . he is a young boy . . . just out of school, with a very limited experience." Mr. Conner replied, "This plant practically runs itself. . . . He [the son] has got all the experience that is necessary. He has been here for a year or upwards, in the yard, and he has had some experience in the office, and in a very short time I could train him so that he would have a perfect working knowledge of the whole business, very simple." He represented to the defendant that the business was a "good investment". He said the "plant was producing at that time a net profit of $3,000 a month".

Two months later the parties again conferred regarding the proposed sale. Mr. Butler testified that the plaintiff then represented his interest in the business to be worth $100,000, but offered it to him for $85,000. He said the plaintiff "took a sheet of paper and a pencil . . . and wrote this figure [$100,000] and then said to me, 'My half interest in this business is worth this figure.' . . . Then he says, 'I will sell it to you, on account of our relationships, and because you are you,' [for] the figure $85,000." Conner added, "I do that for you. That is what I will sell it to you for. It is worth the other," the sum of $100,000. Mr. Butler testified that during these negotiations Mr. Conner assured him the statement of December 31st, above referred to, was a true and accurate report of the stock on hand, including the respective grades of lumber, designated thereon, and that the notes and accounts receivable were all good. He also stated to the defendant that "I recall one year we had less than one-fifth of one per cent . . . losses on over $500,000.00 worth of business."

March 17, 1924, the plaintiff became ill and went to the hospital. He was incapacitated for work for a period of about two months. During the absence of the plaintiff, J. C. Butler, the son of the defendant, took charge of the business for the company. About thirty days before the defendant purchased from the plaintiff his share of the stock, L. H. Chapman, an experienced lumber dealer, became the manager of the business. After the recovery of the plaintiff negotiations for the sale of plaintiff's interest in the business were renewed. May 16, 1924, the defendant purchased plaintiff's half-interest in the business for the agreed sum of $60,000. The sum of $10,000 was paid in cash. The balance of the purchase price, to wit: $50,000 was represented by a promissory note which was executed and delivered to the plaintiff together with certain stocks and bonds to be held as collateral security for the payment thereof. The business was a failure and the stock proved to be of small value. The note was not paid at maturity. Some of the collateral was sold and applied to its payment. The note was renewed June 30, 1927. It remained unpaid at maturity.

There is substantial evidence to indicate that while J. C. Butler, the son of the defendant, was employed by the lumber company for a period of time, he served under the direct supervision of the plaintiff and was not an agent or personal representative of his father in the performance of his duties; that he collected accounts, but was not familiar with the financial standing of the customers or the value of the notes and accounts in general; that he had no special knowledge of the lumber business or the quality or grades of the lumber on hand; that he made no reports to his father regarding the assets of the business; that the defendant acquired an interest in this lumber business and subsequently purchased the plaintiff's stock therein solely because of his confidence in the integrity and business ability of the plaintiff; that he relied upon the representations which were made by the plaintiff regarding the quantity and character of lumber on hand, the value of the notes and accounts and the condition of the business, and that he sustained a loss in the purchase of plaintiff's stock equal to the amount of the unpaid portion of the note upon which this suit is founded.

While the evidence is conflicting, we are unable to say it does not sustain the implied finding that the statement which was rendered by the plaintiff December 31, 1923, upon which the defendant relied, was radically inaccurate. The lumber which was listed in various grades and appraised at $134,411.29, was of much less value. A large amount of this lumber which was stacked in the sheds and yard so that its condition could not be readily ascertained was greatly deteriorated. A considerable amount of the lumber was affected by dry-rot. Much of the lumber therefore belonged to a lower grade from that in which it was listed. It was worth much less than the amount for which it was appraised. The defendant had no knowledge of this fact, and no reasonable means of acquiring the information. Mr. Conner informed the defendant that the notes and accounts listed in the statement as receivable "were good". He testified that lumber was usually sold on a cash basis payable in thirty or sixty days' time, or at two per cent discount for cash upon delivery. He also admitted that an account which was unpaid after ninety days was not considered good. He said the character of an account depends largely upon the standing of the customer. The defendant had little knowledge of the individual customers of the company and therefore depended largely upon the representations of the plaintiff in that regard. Concerning the accounts included in the statement as receivable at a valuation of $114,676.15, Mr. J. C. Butler testified these accounts were of an average age of five and a half months; that the aggregate sum of $38,000 of these accounts was not collected; that of the notes receivable at a valuation of $16,878, the sum of $11,365 was never collected. An allowance for these errors reduces the value of the notes and accounts receivable by approximately the sum of $50,000. This is a substantial depreciation of the value of the assets of the business.

This suit was commenced to recover the unpaid balance due upon this note, amounting to the sum of $37,383.79. The defendant controverted the allegations of the complaint, and alleged that the note was procured by fraud. In a cross-complaint he claimed damages in the sum of $85,000. The jury rendered a verdict against the plaintiff and in favor of the defendant on his cross-complaint for the sum

of $38,000. A judgment was entered accordingly. The judgment for damages in favor of the defendant which was rendered upon the cross-complaint was subsequently waived. The plaintiff appealed from that portion of the judgment which decrees that he take nothing by his action.

The chief question which is involved in this appeal is whether the evidence supports the implied findings of the jury to the effect that the promissory note was procured by means of fraud, and that there was a partial failure of consideration. The appellant asserts that the judgment is not supported by the evidence; that prior to the purchase of plaintiff's interest in the business the defendant's son assumed the management of the business as the agent of the defendant; that the defendant had access to the accounts, that he made an independent investigation of the condition of the business and had full and accurate knowledge thereof, and that he was therefore estopped from asserting fraud in the procuring of the note in question; that the defendant also waived his claim of fraud as to the original transaction by subsequently renewing his note, and that the court erred in giving and refusing certain instructions.

██ Where a note is procured by fraud on the part of the payee, the maker may set up the fraud as a defense to the action upon the note without proceeding to rescind the contract. (*Field* v. *Austen,* 131 Cal. 379 [63 Pac. 692]; *Paolini* v. *Sulprizio,* 201 Cal. 683 [258 Pac. 380]; 22 Cal. Jur. 1092, sec. 142.)

While there is a sharp conflict of testimony the evidence amply supports the judgment. ██ Nor is the defendant barred from asserting his defense of fraud either because he possessed actual knowledge of the true condition of the business or for the reason that he subsequently renewed the note which was given for the purchase thereof. The condition of the lumber and the value of the notes and accounts involved facts peculiarly within the knowledge of the plaintiff. The defendant neither had the knowledge of these assets of the business nor the means of obtaining that information. The jury was therefore entitled to assume these misrepresentations constituted fraud and that there was a partial failure of consideration for the execution of the note in question.

It appears in the present case the plaintiff and defendant were intimate friends and fraternal brothers. The defendant placed great reliance in the ability and integrity of the plaintiff. The plaintiff was an experienced lumber dealer. The defendant was actively engaged in the practice of law. He had no knowledge of the lumber business and no time or opportunity to familiarize himself with the details of this enterprise. Under such circumstances a relationship of trust and confidence existed between the parties which demands a higher degree of good faith and fair dealing than would be required between strangers. (61 A. L. R. 525, note; *Shaeffer* v. *Sleade*, 7 Blackf. (Ind.) 178.)

The existence of a considerable quantity of defective lumber belonging to grades inferior to those which were designated by the plaintiff in his statement to the defendant, and the presence of uncollectible accounts and notes aggregating the approximate sum of $50,000 deducted from a total valuation of $131,554, which accounts were represented by the plaintiff to be good, were discrepancies which warrant a finding of fraud, where the seller knew or by the exercise of reasonable diligence should have known of such variance. Moreover, the representations regarding the former magnitude and profit of the business, if such statements were believed by the jury to be untrue, unquestionably became a proper basis for the finding of fraud. Misrepresentations of material facts bearing upon the question of value or condition of the assets or past earnings of a business may amount to fraud. In 24 Ruling Case Law, 343, section 633, it is said: "In case of a sale of a business, a misrepresentation as to what had theretofore been the amount of its business or profits may be made the basis of a charge of fraud. And the fact that the books showing the amount of the business were at the disposal of the buyer, from which he could have discovered the falsity of the seller's representation, has been held not to affect his right to rely on such representation."

In the present case the condition of the damaged lumber under the circumstances of this case is in the nature of latent defects. The experience of the plaintiff and his familiarity with the lumber on hand should have furnished him with knowledge that such defects existed. The defendant had no such knowledge. The same thing is true with

respect to the character of the customers whose accounts were appraised as good and collectible. The defendant had no reasonable means of ascertaining the value or character of these accounts, and therefore had a right to rely on the representation of the plaintiff in that regard. In 24 Ruling Case Law, 333, section 621, it is said in this regard: "The general rule is that if the defect is latent and not subject to discovery on a reasonable examination, the seller, if he has knowledge thereof, is bound to disclose the same, and his failure to do so may be made the basis of a charge of fraud. Failure to make such disclosure is to be deemed, it seems, fraud in law without regard to the intention to deceive."

The lapse of three or four months from the time when the false statements of the assets and condition of the business were furnished the defendant prior to the actual purchase of plaintiff's stock does not render the misrepresentations less actionable. These inaccurate statements were never thereafter corrected. The defendant testified that he purchased the plaintiff's interest in the business relying upon these statements.

The mere fact that J. C. Butler is the son of the defendant and that he was employed by the company in the lumber-yard for several months prior to the transfer of the business does not charge the defendant with actual knowledge of the condition of the lumber on hand or the state of the accounts. It appears that J. C. Butler did not have accurate knowledge of these matters. He was employed by the company, and not by the defendant. He served the company. He did not represent the defendant in this employment. He testified that he did not communicate to his father what knowledge he did acquire regarding the accounts. As an inducement for the defendant to purchase the business the plaintiff said: "In a very short time I could train him [the son] so that he would have a perfect working knowledge of the whole business." The jury had a right to assume the son was employed by the company under the direct supervision of the plaintiff. The question as to whether the son did acquire knowledge of the actual condition of the business and accounts and did communicate those facts to his father were matters for the jury to determine from all the evidence of the case. The

mere fact that J. C. Butler is the son of the defendant does not necessarily constitute him his father's agent in the performance of his duties in connection with this lumber business. There is ample evidence to support the implied finding that J. C. Butler was not employed in the lumber-yard as the agent or representative of his father.

There is also substantial evidence to the effect that the defendant made no independent investigation of the condition of the business or the value of the assets which will bar him from asserting fraud as a defense to this action. It is true that Mr. L. H. Chapman, an experienced lumber dealer, was employed as manager of the Sacramento Lumber Company in March, 1924. This was two months before the defendant purchased the business. Chapman did not check on the quantity or grades of lumber in the yard. He was unable to ascertain the financial standing of the customers or the exact character of the accounts. He testified that the defendant said to him, "I have no way of checking the stock in the yard . . . but he said he was satisfied that the stock was all right or near correct. . . . Q. The thing he wanted to know from you was whether or not the prices were correctly stated? A. That is what he asked me, relative to the prices."

Mr. Chapman did inform the defendant that some of the lumber had been valued too high in the plaintiff's inventory. ▆ Knowledge on the part of the defendant of slight misrepresentations with respect to the price of lumber will not bar his right to rely on the defense of fraud when other discrepancies exist which are so much more serious, such as the character and value of the notes and accounts, and the quantity and grades of the lumber on hand. In 12 California Jurisprudence, 761, section 35, it is said:

"Where one conducts an investigation, he may still be entitled to rely upon certain representations as to conditions to which the investigation does not extend."

The condition of the business was not previously investigated by the defendant. ▆ Neither was the renewal of the note a bar to the defendant's plea of fraud. He testified that he made no investigation of the affairs of the company so as to discover the fraud until shortly before the action was commenced; that he had no knowledge of the discrepancies at the time he renewed his note. The fol-

lowing examination of the defendant occurred: "Q. Didn't you have knowledge of the fact soon after you took possession . . . [the same knowledge] that you had in 1927? A. No sir. Q. Now didn't you know anything at all about the books or the accounts receivable and the notes receivable, before that? A. No sir. Q. Was it never called to your attention at any time, and you never knew that it was necessary to write off a portion of the accounts receivable and the notes receivable until 1927? . . . A. I did know that accounts were being written off for us, but I did not know the enormity of the accounts. I did not know there was some thirty-four or thirty-seven (thousand) dollars worth that necessarily had to be written off until recently. Q. Well when did you find that out? A. Well, definitely speaking, I arrived at the figure not so very long ago. . . . Q. You never made any investigation . . . of the situation concerning the Sacramento Lumber Company that would give you any information as to the condition of affairs for more than three and a half years; is that what you would have the jury believe, Mr. Butler? A. Yes." There is therefore sufficient evidence to support the implied findings that the defendant made no independent investigation of the business, and that he did not know the inaccuracies of the plaintiff's representations at the time of his purchase of the stock or when his note was renewed.

The defense to the note on the ground of fraud was not waived by the mere renewal of the note. There is a conflict of evidence regarding the defendant's knowledge of alleged fraud at the time he renewed the note. This court is therefore bound by the determination of the jury in that regard. The defendant testified positively that he had no such knowledge when the note was renewed. In the case of *Mazuran* v. *Stefanich*, 95 Cal. App. 327, 334 [272 Pac. 772, 775], it is said: "Ratification of a fraudulent transaction can only be made where there is a full knowledge of the facts constituting the fraud (*Siebold* v. *Berdine*, 61 Cal. App. 158 [214 Pac. 655]) and depends primarily on the intention of the party as shown by his declarations, acts and conduct. (*French* v. *Freeman*, 191 Cal. 579, 590 [217 Pac. 515].)"

It is true that the renewal of a note with full knowledge of the exercise of fraud in procuring it may estop the

maker from denying the obligation on that ground. (*Schmidt* v. *Mesmer,* 116 Cal. 267 [48 Pac. 54]; *Jackson* v. *Meinhardt,* 99 Cal. App. 283, 289 [278 Pac. 462]; 24 R. C. L. 352, sec. 641.) In the present case, however, the conflict of evidence regarding the defendant's knowledge of fraud at the time of the renewal of the note must be resolved in support of the judgment. ▉ Moreover, the plaintiff failed to plead an estoppel to the defendant's charge of fraud which was alleged in the cross-complaint. The cause was tried on the theory that this estoppel did not apply. The doctrine of estoppel which might be created by the renewal of the note may not be applied to defeat the defendant's charge of fraud for the first time on appeal. In the examination of Mr. Butler upon this subject of estoppel, the appellant withdrew his question and abandoned pursuit of evidence in support of that theory. In his argument to the jury, referring to this subject of defendant's knowledge of the alleged fraud at the time of the renewal of his note, counsel for the plaintiff conceded that the conduct of the defendant did not constitute a bar to his defense of fraud. He said, "I did not say that it was a legal bar. . . . I did not refer to a legal bar, but it is a matter of evidence. . . . When a man continues to deal with a man after he knows he has been defrauded, then it is a matter for the jury's consideration," in determining whether the defendant had such knowledge of the fraud at the time he renewed the note. The question as to whether the defendant was estopped from relying upon the plaintiff's alleged fraud was therefore not an issue in the case. It was waived.

▉ The appellant charges the court with prejudicial error in refusing to give his proposed instruction number four, which reads as follows:

"You are instructed that the defendants cannot recover on their cross-complaint in this action unless they were deceived by the alleged misrepresentations, and if the means of knowledge are at hand, equally available to both parties and the subject of purchase is alike open to their inspection, if the purchasers do not avail themselves of these means and opportunities, they will not be heard to say that they have been deceived, unless they were induced by the

trick or misrepresentation of plaintiffs not to make such inspection.''

The first portion of this instruction to the effect that the defendants cannot recover ''unless they were deceived by the alleged·misrepresentations'', is fully covered by other instructions which were given to the jury. The balance of this instruction is objectionable for the reason that it assumes there is evidence that both parties had an equal opportunity to secure knowledge respecting the value and condition of the various elements of the lumber business which were involved in the sale. The record is devoid of evidence upon which this assumption may be founded. The evidence is uncontradicted that the plaintiff was the sole active manager of the business for many years prior to the sale. He knew the character, quantity and grades of lumber on hand. He knew the individual customers and their financial standing. He knew the character of the notes and accounts receivable which made up a substantial part of the assets of the business. The evidence is also uncontradicted to the effect that the defendant had no active participation in the business. It would be absurd to contend that the defendant could tear down three million feet of lumber which were stacked in the yard to search for dry-rot. It is equally absurd to contend that the defendant could investigate the personal integrity and financial standing of the numerous customers who owed the company notes or accounts. There is no evidence upon which the jury would have been warranted in finding that ''the means of knowledge . . . (were) equally available to both parties''. Moreover this instruction does not inform the jury that the defendants could not defeat the plaintiff's demand for payment of the note upon their allegations of fraud contained in the answer. It merely asserted that the defendants ''cannot recover on their *cross-complaint*'', under such circumstances as are recited in the instruction. It is true that the defendants did recover a judgment for damages upon their cross-complaint for the sum of $38,000. This part of the judgment was, however, waived. That feature of the judgment is not an issue on this appeal. The plaintiffs may therefore not complain on that account. In effect, the defendants ultimately recovered nothing upon their cross-complaint. The only issues before this court on appeal are

those which are contained in the complaint and answer. The refusal of this instruction was therefore not erroneous.

 The appellant contends that the giving of defendants' instruction number five was erroneous. That charge reads as follows:

"The jury is instructed that it is not their duty to seize lightly upon some small circumstance to deny relief to a party plainly shown to have been actually defrauded against those who defrauded him on the ground that he did not discover the fact that he had been cheated as soon as he might have done. It is only where the party defrauded should plainly have discovered the fraud except for his own inexcusable inattention that he will be charged with a discovery in advance of actual knowledge on his part."

It is asserted this instruction, in effect, charges the jury as a matter of fact that the defendants had actually been defrauded; that it deprives the jury of the right to determine whether a fraud had actually been perpetrated. This instruction is not as clear as it should have been. It may well have been refused. However, when it is read in conjunction with other instructions which were given to the jury, we are of the opinion it did not mislead the jury. In effect this instruction means that if the jury is satisfied that one has been defrauded by another, the guilty party may not be relieved from the penalty of that deceit merely because the injured party failed to discover the fraud "as soon as he might have done". Standing alone, this portion of the instruction may be erroneous for failure to include an essential element of the subject. But the jury was further charged in this same instruction that the defense of fraud is not available to one who, because of "his own inexcusable inattention", fails to discover the actual facts in advance of the challenged transaction. In other words, this instruction charges the jury that one must exercise due diligence on his own part to discover the actual facts concerning the transaction in which he proposes to engage, or he may not ordinarily complain of fraud. It is stated that slight circumstances rebutting the evidence that the injured party used due diligence to discover the facts, would not defeat his right to plead fraud. It must be assumed the jury would distinguish between slight circumstances regarding a lack of diligence and substantial evidence of such neg-

ligent conduct. In plaintiffs' instruction number one, the jury was charged that "the burden of proof rests upon the defendants . . . to prove by a preponderance of the evidence and to your satisfaction that the alleged fraudulent acts and misrepresentations . . . actually existed''. In plaintiffs' instruction number three the jury was clearly instructed that before it could find in favor of the defendants ''the evidence must be clear and convincing'' that the plaintiffs made the alleged misrepresentations with intent to deceive the defendants; that the defendants were actually deceived thereby; that the defendants relied upon the truthfulness of these statements and were persuaded thereby to purchase the property in controversy to their damage. All of the necessary elements of fraud were elsewhere given, and we are therefore of the opinion this instruction was not prejudicial.

Finally the appellant challenges the giving of defendants' instruction number seven. This charge correctly states the measure of damages incident to the execution of a contract which is procured by means of fraud. It is contended this instruction is erroneous because it omits to charge the jury that the defendants would be estopped from relying upon fraud if they failed to use due diligence to discover the actual facts before renewing the note which was given for the purchase of the property. The foregoing instruction number five, which was given, charges the jury, in effect, that a lack of diligence exercised to discover fraud will bar one from relying on that defense. Moreover the issue regarding defendants' estoppel to rely upon fraud merely because of the renewal of the note was waived at the trial by counsel for the plaintiffs. We are of the opinion this last instruction was therefore not erroneous. The jury was fairly instructed upon the law of the case. It does not appear there was a miscarriage of justice.

The judgment is therefore affirmed.